[Civ. No. 22924. Second Dist., Div. Two. Sept. 28, 1959.]

PAUL M. DARWIN, Plaintiff and Appellant, v. NONNIE GANGER, Defendant and Appellant.

Bebette E. Gualano and William N. Bowie, Jr., for Plaintiff and Appellant.

Jack Dunaway for Defendant and Appellant.

HERNDON, J.—This litigation involves a dispute over the custody of a 12-year-old child, Marsha Darwin, who was born out of wedlock. The parties here contesting are Paul Darwin, the father, and Nonnie Ganger, the mother, who have never intermarried. There is no dispute concerning paternity.

The instant appeals are from a pendente lite order which determines custodial rights only pending a plenary trial on the merits. The father appeals from the provisions of the order which (1) declare him unfit, (2) award custody to the mother and (3) require him to pay $300 attorney's fees. The mother appeals from the portion of the order which declares "[t]hat for the purposes of this pendente lite order . . . the said minor child . . . has been legitimated under section 230 of the Civil Code . . . and is deemed to be legitimate from the time of her birth."

We shall attempt to epitomize the essential facts disclosed by the record of a very lengthy hearing. We think it would serve no useful purpose to reproduce here in full detail the unflattering portraits which each parent painted of the other.

The child was born on October 13, 1946, while Darwin was a boarder in the mother's home. The mother was a widow and had a son by an earlier marriage named James Skidmore who was three years older than Marsha.

Darwin lived with the mother for about four months after Marsha's birth. During that time he was married to a woman who resided in England with a child born of that marriage. In 1950 Darwin obtained a divorce from his English wife. In 1951 Marsha's mother married one Leon Ganger. A son was born to Mr. and Mrs. Ganger. This marriage, a stormy one, was terminated by divorce in 1956. In 1951 or 1952, Darwin married Pauline Butler Darwin. This marriage also terminated in divorce, and at the time of the instant proceedings Darwin was unmarried.

After leaving the mother's home early in 1947, Darwin maintained a fairly constant relationship with his daughter. Although from time to time he gave food, clothing and money to the mother and child, his contributions to the child's support were far less than adequate. During the years 1951 to 1956 he contributed a total of $1,105 in money payments

for such support. In 1953, he entered a plea of guilty to a charge of failure to provide for Marsha.

It appears that in 1937 Darwin was convicted in England of the crime of obtaining money by false pretenses. He is evidently a Canadian citizen, and in May, 1957, a hearing was held before the United States Department of Justice Immigration and Naturalization Service regarding the legality of his presence in this country in the light of his prior conviction. That hearing terminated in Darwin's favor, but the determination was not final and it was certified to the Board of Immigration Appeals, where, as late as June, 1957, the matter was still pending.

Darwin was employed as a traveling manufacturer's representative and in June of 1956 Mrs. Ganger allowed her two older children, James and Marsha, to accompany him on an extended business trip throughout several states. Darwin testified that on this trip he first discovered that Marsha was extremely unhappy in her mother's home, was fearful of her mother and stepfather, Leon Ganger, and that Ganger, a registered sex offender, had attempted to molest her sexually on several occasions.

On returning to California in July, 1956, Darwin did not return Marsha to the custody of her mother, but instead enrolled the child in a private boarding school, Ramona Convent of the Holy Names in Alhambra, California. He then proceeded to swear out a criminal complaint against Ganger for molestation, and on September 18, 1956, he filed the present action to obtain legal custody of Marsha. Mrs. Ganger answered and cross-complained, praying that Darwin be ordered to pay support and that she be awarded custody.

Darwin's petition for pendente lite custody and Mrs. Ganger's counter petition came on for hearing in January, 1957. The testimony of the parties disclosed the facts above recounted. Marsha testified to a number of occasions when Ganger, her stepfather, had attempted to molest her sexually. She clearly indicated her desire to remain in the custody of her father and to remain in the parochial school where he had placed her. Although Mrs. Ganger testified that she had discontinued all relations with Ganger, it was indicated that he continued to come to her home in the exercise of his right to visit the child of his marriage to her. Each party called a number of witnesses whose testimony need not be detailed. Darwin's witnesses portrayed Mrs. Ganger as erratic and emotionally unstable; they told of the turbulence of her re-

lations with Ganger and of Marsha's unhappiness in that environment. Mrs. Ganger's witnesses, on the other hand, spoke approvingly of conditions in the new home which she had established after her separation from Ganger and of her conscientious, diligent and unaided struggles to provide for the support of her three children.

On June 26, 1957, the trial judge filed a memorandum opinion in which he indicated an intention to make the child a ward of the court, and a determination that both parents were unfit to have the child's custody. However, on September 16, 1957, without taking additional evidence, the trial judge filed a second memorandum opinion stating that "[a] re-consideration of the facts convinces me that while defendant was probably not fit at one time, conditions have changed materially and I shall hold that she is now a fit person and shall award her the custody of the child. Plaintiff will be allowed to visit at reasonable times under circumstances that do not permit the removal of the child from defendant's custody." The order under review was entered on October 16, 1957, and the relevant portions thereof read as follows:

"I. That for the purposes of this pendente lite order and judgment, the said minor child, Marsha Michele Darwin, has been legitimated under Section 230 of the Civil Code of the State of California and is deemed to be legitimate from the time of her birth.

"II. That plaintiff is not a fit person to have the custody of said minor child pendente lite; that defendant is a fit person and defendant is hereby awarded her custody pendente lite. Plaintiff shall be allowed to visit said child at reasonable times under circumstances that do not permit the removal of the child from defendant's custody.

"III. . . . Plaintiff is further ordered to pay, in addition to all sums heretofore ordered, the sum of $300.00 forthwith to Jack Dunaway, attorney for defendant."

There are, as we have noted, two appeals from this order. Darwin appeals from the portions of the order which declare him unfit, declare the mother fit, and which award custody of Marsha and attorney's fees to Mrs. Ganger. It is Darwin's contention that these portions of the judgment are unsupported by the evidence and constitute an abuse of judicial discretion. Mrs. Ganger has appealed from that portion of the order which declares that, for the purposes of the pendente lite proceedings, Darwin had legitimated Marsha under the provisions of section 230 of the Civil Code. She contends

that Darwin failed entirely to carry his burden of proving compliance with the requirements of the statute upon which he based his right to claim custody.

### The Issue as to Legitimation by the Father

Since the father's capacity to assert any right to the custody of a child born out of wedlock depends upon proof of legitimation, it is logical that we first determine the question presented by the mother's appeal.

■ "When the mother and father of an illegitimate child are both alive and he has not been legitimated, the mother is entitled to his custody, services and earnings to the exclusion of the father." (*Guardianship of Smith*, 42 Cal.2d 91, 93 [265 P.2d 888, 37 A.L.R.2d 867].) ■ Under section 200 of the Civil Code[1] the mother of an illegitimate child has an absolute right to its custody to the exclusion of any rights in the child's father solely by virtue of his paternity. (*Cf. Strong v. Owens*, 91 Cal.App.2d 336, 340 [204 P.2d 48] ; *In re Navarro*, 77 Cal.App.2d 500, 505 [175 P.2d 896].)

■ The trend of legislation governing the rights of persons born illegitimate has been to give them the same status as those born legitimate. (*Estate of Garcia*, 34 Cal.2d 419, 422 [210 P.2d 841].) ■ And, three methods are provided by our statutes by which illegitimate offspring may be legitimated: (1) by the marriage of the parents of a child subsequent to its birth,[2] (2) by the public acknowledgment by the father of an illegitimate child and the reception of the child into his family,[3] and (3) for purposes of limited succession, by the father's signing an instrument before a competent witness in which he acknowledges paternity.[4]

---

[1]Section 200. "The mother of an illegitimate unmarried minor is entitled to its custody, services, and earnings."

[2]Civil Code, section 215: "*Legitimation by marriage of parents* A child born before wedlock becomes legitimate by the subsequent marriage of its parents."

[3]Civil Code, section 230: "*Illegitimate child; adoption by father* ADOPTION OF ILLEGITIMATE CHILD. The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth. The foregoing provisions of this Chapter do not apply to such an adoption."

[4]Probate Code, section 255: "*Illegitimate children; inheritance rights; limitations* Every illegitimate child is an heir of his mother, and also of the person who, in writing, signed in the presence of a competent witness, acknowledges himself to be the father, and inherits, his or her estate, in whole or in part, as the case may be, in the same manner

 Section 230 of the Civil Code was enacted in 1872, and has never been amended. Although this section uses the word "adopts" our Supreme Court has recognized ". . . that there is a natural and basic difference between the adoption of blood strangers and the adoption by legitimation of a natural child [by its father]." (*Estate of Lund*, 26 Cal.2d 472, 492 [159 P.2d 643, 162 A.L.R. 606]; *Blythe* v. *Ayres*, 96 Cal. 532, 559 [31 P. 915, 19 L.R.A. 40].) Thus, section 230, in providing that the father of an illegitimate child adopts his offspring by publicly acknowledging it as his own, uses the term "adopts" in the sense of "legitimates" and the effect of the father's act ". . . is to change the *status* and capacity of an illegitimate child to the *status* and capacity of a child born in lawful wedlock." (*In re Navarro, supra,* 77 Cal.App.2d 500, 504; *Blythe* v. *Ayres, supra,* 96 Cal. 532, 559-560.)

 The purpose of the code section is to permit the father to make reparation to the child by taking it into his home without the publicity which would be incidental to a judicial proceeding of adoption. As stated by the code commissioners, the publicity of a judicial proceeding (see Civ. Code, §§ 221 et seq.) would brand the child with the very stigma from which a repentant father would desire to save it.

However, whichever method of legitimation was employed, judicial proceedings (Civ. Code, § 221 et seq.), or a course of conduct (Civ. Code, § 230), the code framers provided that the power of a father to legitimate his offspring would be limited *if he were married.* Thus, section 223 of the Civil Code originally provided: "A married man, not lawfully separated from his wife, cannot adopt a child without the consent of his wife."[5] Similarly, section 230 by its terms provided that "The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, *with the*

---

as if he had been born in lawful wedlock; but he does not represent his father by inheriting any part of the estate of the father's kindred, either lineal or collateral, unless, before his death, his parents shall have intermarried, and his father, after such marriage, acknowledges him as his child, or adopts him into his family; in which case such child is deemed legitimate for all purposes of succession. An illegitimate child may represent his mother and may inherit any part of the estate of the mother's kindred, either lineal or collateral."

[5]The following year the section was amended, and section 223 now reads: "A married man, not lawfully separated from his wife, cannot adopt a child without the consent of his wife, nor can a married woman, not thus separated from her husband, without his consent, provided the husband or wife, not consenting, is capable of giving such consent."

*consent of his wife, if he is married,* into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth. The foregoing provisions of this Chapter do not apply to such an adoption.'' (Emphasis added.)

If a man has no wife, he can legitimate his offspring by a course of conduct which the community could consider a public acknowledgment that he was the father of the child, (*Estate of Gird,* 157 Cal. 534, 542-543 [108 P. 499, 137 Am. St.Rep. 131]) but the existence of such public acknowledgment by an unmarried man is a question to be decided on the circumstances of each case. (*Estate of Baird,* 193 Cal. 225, 274-279 [223 P. 974].) Where a man has no wife, he can publicly acknowledge his child notwithstanding the fact that he does not maintain a household into which the child is taken. (See *Blythe* v. *Ayres, supra,* 96 Cal. 532, 560, 592-593; *In re Jessup,* 81 Cal. 408, 433-434 [21 P. 976, 22 P. 742, 1028, 6 L.R.A. 594].) If the man is unmarried the ''family'' referred to in section 230 may consist only of the father, the mother, and the child. (*Estate of Gird, supra,* 157 Cal. 534, 540; *Serway* v. *Galentine,* 75 Cal.App.2d 86, 90 [170 P.2d 32].) Thus, an unmarried man may legitimate his offspring by living with the mother and child for a short period during which he represented the mother as his wife and the child as his own. (*Serway* v. *Galentine, supra,* 75 Cal.App.2d 86, 90-91.)

But when a man is married, his power to legitimize the offspring of his meretricious relationship is expressly limited by the terms of the statute. His wife must *consent* to the reception into the family of the offspring with knowledge of the illegitimacy. (*Estate of Flood,* 217 Cal. 763, 767 [21 P.2d 579]; see *Estate of Heaton,* 135 Cal. 385, 388-389 [67 P. 321].) Although the father of a child has lived separate and apart from his lawful wife for years, and has lived continuously with another woman with whom he maintained a settled and fixed home, he cannot legitimize the issue of his meretricious relationship by a course of conduct otherwise complying with the provisions of Civil Code, section 230. (*Laugenour* v. *Fogg,* 48 Cal.App.2d 848 [120 P.2d 690].)

As stated in *Estate of Flood,* 217 Cal. 763, 767: ''To establish her claim of legitimation under this section as construed by a number of decisions of this court, petitioner must sustain the burden of proof of the following elements: (1)

*Illegitimacy:* that she is an illegitimate child; (2) *paternity:* that James L. Flood was her father; (3) *public acknowledgment:* that he publicly acknowledged her as his own child during her minority; (4) *reception into the family with wife's consent:* that she was received into his family with his wife's consent, given with knowledge of the illegitimacy; (5) *treatment as legitimate:* that he otherwise treated petitioner as if she were his legitimate child."

▮ The question is normally one for the trier of fact to resolve (see *Serway* v. *Galentine, supra,* 75 Cal.App.2d 86, 90-91; *Estate of Flood, supra,* 217 Cal. 763.) But there must be evidence in the record to establish all of the facts required by section 230 or the judgment must be reversed. (*Estate of Baird, supra,* 193 Cal. 225, 274; *cf. Serway* v. *Galentine, supra,* 75 Cal.App.2d 86, 91.) ▮ The burden of establishing legitimation under Civil Code section 230 rests on the party asserting the paternal relationship, whether it be the father claiming custody (*In re Navarro, supra,* 77 Cal.App.2d 500) or the child claiming rights in his father's estate. (*Estate of Flood, supra,* 217 Cal. 763.)

▮ In the case at bar Darwin bases his claim that Marsha was legitimated entirely upon testimony that during the period of four months following the child's birth, he and the mother lived together as husband and wife, publicly holding themselves out as such, Darwin, at the same time, making public acknowledgment of the child as his own. But it appears from Darwin's own testimony that during this period of time he was married to a woman living in England. Thus, under the authorities above discussed, he was without power to legitimate his offspring without his wife's consent. The record is devoid of any evidence that Darwin's conduct during any period when he was unmarried was of such character as to satisfy the requirements of the statute. It follows that the portion of the order from which Mrs. Ganger has appealed cannot be sustained.

### Fitness of the Parents

▮ Although there was evidence tending to prove that in the past Mrs. Ganger had been somewhat lacking in stability, and that during earlier periods conditions in her home had been quite unsuited to the welfare of her children, there was also evidence that at the time of the hearing she was living a life of rectitude, and that she was maintaining a suitable home. We hold that there was substantial evidentiary sup-

74

port for the trial court's finding that the mother was fit to have the custody of her daughter.

 As we recently stated in *Ducharme* v. *Ducharme*, 152 Cal.App.2d 189, 193 [313 P.2d 33]: "In *Davis* v. *Davis*, 41 Cal.2d 563 [261 P.2d 729], it is pointed out at page 565 that: 'The court has broad discretion in matters pertaining to the change of custody of children.' In passing on such questions, 'It is the welfare of the child and not the shortcomings of the respective parties which is determinative.' (*Young* v. *Young*, 117 Cal.App.2d 735, 738 [256 P.2d 1009]; *Clarke* v. *Clarke*, 35 Cal.2d 259, 262 [217 P.2d 401].) It has been held repeatedly that the trial judge having heard the evidence, observed the witnesses, their demeanor, attitude, candor or lack of candor, is best qualified to pass upon and determine the factual issues presented by their testimony; and, observes the court in *Currin* v. *Currin*, 125 Cal.App.2d 644, 651 [271 P.2d 61], 'this is especially true where the custody of minor children is involved. An appellate tribunal is not authorized to retry the issue of custody, nor to substitute its judgment for that of the duly constituted arbiter of the facts.' It is the trial court's responsibility to pass on the credibility of witnesses, the weight to which their testimony is entitled, and the inferences to be drawn from the evidence. On appeal it is, of course, the duty of this court to view the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the successful party in the court below."

It should be pointed out that irrespective of whether or not Darwin had legitimated the child, a finding of his unfitness was not necessary in order to justify awarding custody to the mother. When custody of a minor child is awarded to one of the parents, it is not necessary to find that the other parent is unfit for its custody. The fitness of a parent of a minor child is required to be determined only when its custody is awarded to someone other than a parent. (*Guardianship of White*, 84 Cal.App.2d 624, 628 [191 P.2d 466]; and see 37 Cal.Jur.2d 151, § 10.)

## Attorney's Fees

 There is no merit in Darwin's contention that the award of $300 to Mrs. Ganger's attorney constituted an abuse of discretion.

Darwin testified that his earnings in 1954 were in excess of $15,000 and that his gross income in 1956 was $8,000. The record discloses no convincing evidence that he should not

expect to resume profitable employment. The trial court was not obliged to accept Darwin's self-serving statements concerning his lack of assets or the unfavorable prospects as to future earnings.

The order is modified by striking therefrom paragraph I reading as follows:

"I. That for the purpose of this pendente lite order and judgment, the said minor child, Marsha Michele Darwin, has been legitimated under section 230 of the Civil Code of the State of California and is deemed to be legitimate from the time of her birth."

As modified the order is affirmed. Respondent Ganger will recover her costs on appeal.

Fox, P. J., and Ashburn, J., concurred.