[Civ. No. 21859. First Dist., Div. One. May 20, 1965.]

Estate of PAUL FRANCESCO BASSI, Deceased. IDA
ROSSI et al., Plaintiffs and Appellants, v. UMBERTO
ZAPPATERRA et al., Defendants and Respondents.

Emmet B. Hayes and Sanborn H. Smith for Plaintiffs and Appellants.

Saveri & Saveri and Richard Saveri for Defendants and Respondents.

SIMS, J.—Petitioners Rossi et al., who are descendants of brothers and sisters of the father of the decedent, appeal from a judgment establishing heirship in favor of petitioners Zappaterra, as half-brothers of the decedent, entered after proceedings conducted following the filing of several answers by the respective petitioners to a petition for distribution filed in the matter of the estate of the decedent by the public administrator.

Paul Francesco Bassi, a resident of the State of California, died intestate at Napa State Hospital, October 23, 1958. He left no persons of closer relationship than those involved in this controversy as the heirs at law of his estate which consists of personal property.

He was born January 23, 1871, at Gaiba, province of Rovigo, Italy, the son of Giacomo Antonio Bassi and Giovanna Bassi, nee Zeni, who had been united in matrimony in Ficarolo in the same province on December 5, 1870.

It is established that appellants are the descendants of brothers and sisters of the decedent's father, and are entitled to inherit the estate unless the claimants Zappaterra have superior rights.[1]

One of the principal issues presented by this appeal is the status of Giovanna Zeni. The trial court found: ". . . [she] left and abandoned her husband, Giacomo Antonio Bassi, and their son, Paolo Francesco Bassi, immediately subsequent to the birth of said Paolo in 1871 and prior to the year 1888 . . . [she] became missing and was never again heard from after

---

[1]There are valid powers of attorney on file for these relatives, but for purposes of this appeal they are treated as the real parties in interest. The findings also establish reciprocal rights of inheritance between the United States and Italy and Brazil where various claimants are domiciled.

that time and her whereabouts were never known again continuously for a period of at least seven (7) years after said abandonment; . . . [and she] was dead prior to 1905 and at the time the acts . . . [which respondents claim comprised acknowledgment and adoption pursuant to the provisions of section 230 of the California Civil Code][2] took place." The referee to whom the matter had been referred found: "That Giovanna Zeni Bassi left Giacomo Antonio Bassi and Paolo Francesco Bassi subsequent to the birth of the latter, and that her whereabouts thereafter are not revealed by the evidence"; [and] "That . . . [she] did not consent to the reception of Umberto Zappaterra and Carlo Zappaterra into any family unit of which Giacomo Antonio Bassi was a member." The referee concluded: "That the death of Giovanna Zeni Bassi prior to the year 1906 cannot be inferred or presumed." The evidence bearing on these conflicting conclusions will be hereinafter discussed.

After Giovanna left, and by or before 1888, the decedent's father commenced to live and cohabit with Maddalena Zappaterra in Ficarolo; this relationship was open and notorious and continued until he was confined in a sanitarium in 1903, and finally terminated on his death May 1, 1905. The claimants Carlo Zappaterra, born October 15, 1888, and Umberto Zappaterra, born April 13, 1891, are the natural born issue of said cohabitation and are natural half-brothers of the decedent through their mutual father. During the period of this relationship the decedent, until at least 1888, his father, Maddalena Zappaterra, and all the issue of their relationship, openly lived together as a family and the father publicly acknowledged respondents as his children, received them in his home and treated them as if they were his legitimate children.

After the death of the father of decedent and respondents, the latters' mother on October 13, 1907, married one Ageo Querzoli. In connection with the marriage the parties thereto executed a declaration that "from their natural union there were born two children, [the respondents], . . . [and] that they recognize the above as their own children in order to legitimize them." Appropriate marginal notes referring to the

---

[2]Civ. Code, § 230, provides: "The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth. The foregoing provisions of this chapter do not apply to such an adoption."

marriage and the declaration were entered on the birth certificates of each of the respondents.

The nature and effect of these proceedings are in dispute. The referee concluded that as all parties concerned were residents of Italy the status of respondents was to be determined by the law of that country, that under that law the birth certificates in the absence of direct attack conclusively established their status as the natural children of Maddalena and Querzoli (despite a finding that they were the issue of Bassi), and that as a matter of law respondents were not related to the decedent by blood or marriage. The trial court concluded that respondents were the natural children of Maddalena and Bassi; that they were half-brothers of the decedent, and had been legitimated by Bassi; and that accordingly they were entitled to succeed to decedent's estate.

### The Conclusiveness of the Referee's Report

After the parties had filed their respective answers to the petition for final distribution, the court made an order of reference upon stipulation of all counsel.[3] The referee held extensive hearings and ultimately filed a report which included findings of fact and conclusions of law as noted above in favor of appellants, and recommendations reading as follows: "The referee recommends that a motion be made for approval of this report and adoption of the findings thereof; that notice be given to all parties concerned; that a hearing be had thereon by the court, and that a decree be prepared, signed and filed in conformity with the findings and the conclusions hereof *as approved or modified by the court.*" (Italics added.) Thereupon the appellants gave "Notice of motion for order approving, ratifying and confirming report and adopting findings and recommendations of [the] referee." The matter came on regularly to be heard and respondents filed their objections to the report of the referee.[4] Counsel for appellants joined in suggesting one amendment to the findings of fact,[5] and in agreeing to submit the matter to the court on

---

[3]This order reads in part: "It is hereby ordered that the foregoing matters be referred to . . . as referee for the purpose of conducting hearings, making inquiry, and taking such other measures as he may deem appropriate to a determination of all the issues raised by the pleadings; and upon completion thereof, to make his Findings of Fact and Conclusions of Law thereon, and to make his report in writing thereon to the court."

[4]These objections were not made a part of the record on appeal.

[5]That the proceedings attendant to the marriage of Maddalena and Querzoli made respondents the "legal" rather than the "natural" children of that couple.

the briefs filed with the referee. The matter was continued for further argument or submission. Thereafter, the court rendered its memorandum decision and ordered respondents to prepare findings of fact and conclusions of law in accordance therewith. Respondents filed proposed findings and appellants filed proposed counterfindings and objections thereto without in any way suggesting that the court was without power or jurisdiction to review the referee's report and make findings either consistent or inconsistent therewith. Findings of fact and conclusions of law were settled substantially as proposed by respondents, judgment was entered and this appeal ensued.

In their opening brief the appellants for the first time contend that the judgment of the probate court failed to adopt the findings and conclusions of the referee and should be overruled. They rely upon the provisions of sections 638-645 of the Code of Civil Procedure which provide: ''The finding of the referee or commissioner upon the whole issue must stand as the finding of the court, and upon filing of the finding with the clerk of the court, or with the judge where there is no clerk, judgment may be entered thereon in the same manner as if the action had been tried by the court.'' (§ 644.) In *Ellsworth* v. *Ellsworth* (1954) 42 Cal.2d 719 [269 P.2d 3], the court on motion to dismiss an appeal had to determine whether an order vacating an order which had approved a referee's report was in effect an appealable order for a new trial after a binding judgment of a referee on a general reference, or a mere interlocutory order pending further consideration by and entry of judgment by the court following a special reference. ■ The applicable principles were set forth as follows: ''The provisions of the Code of Civil Procedure relating to proceedings before referees and commissioners preserve the traditional distinction between a general reference, that is, a trial before a referee upon all the issues of fact or of law, and a special reference, in which he considers only part of the issues. ■ A general reference may be had only with the consent of the parties. (Code Civ. Proc., § 638, subd. 1; *Estate of Hart,* 11 Cal.2d 89, 91 [77 P.2d 1082].) 'The finding of the referee or commissioner upon the whole issue must stand as the finding of the court, and upon filing of the finding with the clerk of the court, or with the judge where there is no clerk, judgment may be entered thereon in the same manner as if the action had been tried by the court.' (Code Civ. Proc., § 644.) ■ In such a case, the decision of the referee must be attacked in the same manner

as one made by the court, and an order vacating the decision and directing a rehearing is properly appealable as an order granting a new trial. [Citations.]

██ ''A special reference, however, does not determine the whole issue, and the report of the referee does not become the decision of the court without further action by the trial judge. [Citations.] ██ Until the adoption of the report and the filing of the findings of fact and conclusions of law of the trial court, the report may be set aside without the necessity of granting a new trial. [Citations.] ██ An order vacating such a report is interlocutory only. [Citations.]'' (42 Cal.2d at pp. 722-723.)

Appellants point to the terms of the order of reference, and their similarity to the provisions of subdivision 1 of section 638 of the Code of Civil Procedure.[6] (See fn. 3, *supra.*) They rely on *Estate of Hart* (1938) 11 Cal.2d 89 [77 P.2d 1082]; *Lewis* v. *Grunberg* (1928) 205 Cal. 158 [270 P. 181]; *Thompson* v. *Patterson* (1880) 54 Cal. 542; *Peabody* v. *Phelps* (1858) 9 Cal. 213; and *Weavering* v. *Schneider* (1921) 52 Cal.App. 181 [198 P. 418] for the propositions that the reference was general, that judgment should have been entered on the referee's findings of fact and conclusions of law, and that the only attack respondents could make on the referee's report was by attacking the judgment by motion for new trial or appeal. The foregoing cases all recognize the principles as quoted in *Ellsworth* v. *Ellsworth, supra,* but they do not necessarily require that this court disregard the action and judgment of the trial court in this case. In *Hart* the issue was whether the reference was to a court commissioner, in which event appellant had been denied his right to argue exceptions before the court, or a general reference to a referee, in which event judgment had properly been made and entered by the court without such hearing after full proceedings before the referee. In finding it was the latter, and affirming the judgment, the court reflected: ''While the original minute order of reference was so brief as perhaps to be uncertain, the subsequent developments must necessarily have made clear to appellant that Mr. Mullin was acting as a referee, and if in fact

---

[6]Code Civ. Proc., § 638, provides: ''A reference may be ordered upon the agreement of the parties filed with the clerk, or judge, or entered in the minutes or in the docket:

''1. To try any or all of the issues in an action or proceeding, whether of fact or of law, and to report a finding and judgment thereon;

''2. To ascertain a fact necessary to enable the court to determine an action or proceeding.''

there was no agreement of reference, it is most extraordinary that no point was made as to this until after adverse findings were clearly indicated. The participation in the hearing and subsequent consideration of the case, with knowledge of Mr. Mullin's statements, is indicative either of a prior consent to the reference or a waiver of objection thereto. (See *Garland* v. *Smith,* 131 Cal.App. 517 [21 P.2d 688]; *Shain* v. *Peterson,* 99 Cal. 486 [33 P. 1085].)'' (11 Cal.2d at pp. 91-92.) As will be noted below, this is just the converse of the situation here where appellants with knowledge of the recitals in the referee's report that it was to be reviewed like a special reference participated in the proceedings which ensued and only now object after an adverse decision. Furthermore, in *Hart* the court looked to the recitals in the judgment in determining it a general reference. Here the fact that the findings and judgment each recite that the matter was submitted to the judge of the trial court on all the evidence oral and documentary suggests that the trial court, as well as the parties, intended a limited reference which was to be reviewed by the court.

The *Lewis* case is more helpful to appellants. It is authority for the proposition that where there is a true general reference, the appellate court will set aside an unauthorized modification of the referee's recommended judgment by the trial court, and modify the court's judgment to accord with that of the referee. In *Lewis* as in *Hart,* the court looked to the recitals in the referee's report and in the court's findings and judgment to determine that a general reference was made. It was considered significant that the trial court did not have before it the evidence submitted to the referee, and that the reference was couched in the express statutory language '' 'to report a finding and judgment thereon.' '' (205 Cal. at p. 161; cf. Code Civ. Proc., § 638, subd. 2.)

*Thompson* merely holds that an order purporting to grant a new trial before judgment is entered on the referee's report cannot be reviewed. (54 Cal. at p. 546.) *Peabody* involved the time within which to make objections as arising before or after judgment There was no question as to the nature of the reference and as it was general the time was after judgment. (9 Cal. at pp. 224-225.) *Weavering* found there was but a special reference, and that the only proper judgment could be that entered by the court on adopting the findings and conclusions of the referee.

Respondents rely on language indicating that the court's action in reviewing the report and making an order and judg-

ment thereafter is an indication that a special reference was intended. (See *Ellsworth* v. *Ellsworth, supra,* 42 Cal.2d 719, 722-723; *Estate of Ruben* (1964) 224 Cal.App.2d 600, 607 [36 Cal.Rptr. 752].) ▪ Of course, if the reference is special in the sense that the court has reserved the right to determine the action or proceeding (Code Civ. Proc., §§ 638, subd. 2, 643 and 645; and cf. §§ 638, subd. 1, 643, 644 and 645) the court may modify and change the referee's findings. (*Schefski* v. *Anker* (1932) 216 Cal. 624, 627-628 [15 P.2d 744]; *Clark* v. *Millsap* (1926) 197 Cal. 765, 784-785 [242 P. 918]; *San Diego Fruit & Prod. Co.* v. *Elster* (1954) 127 Cal.App.2d 80, 85-86 [273 P.2d 70]; *National Brass Works* v. *Weeks* (1928) 92 Cal. App. 318, 320-322 [268 P. 412].) In fact it has been suggested that even with a general reference this course may be followed where the conclusions of law are not justified by the facts found. (*Calderwood* v. *Pyser* (1866) 31 Cal. 333, 337.)

▪ Although the matter is not free from doubt on the basis of the order of reference, the recitals in the report of the referee, the conduct of the parties in connection with the hearing on the report of the referee, the action of the court thereon and the recitals in the court's findings and judgment, it is concluded that the court never surrendered the power to ultimately determine the proceeding. ▪ In fact *Lewis* recognizes that unless it clearly appears to the contrary the reference will be presumed to be special for the benefit of the court. (205 Cal. 158, 161.)

▪ In any event, it would appear from the facts outlined above that appellants are estopped from attacking the procedure followed by the trial court. They acquiesced in the referee's recommendation that a hearing be held before the court to the end that the findings and conclusions be approved or modified; they joined in submitting the matter to the court and requested a modification themselves; and they participated without objection to the procedure, in the court's proceedings to settle its own findings of fact and conclusions of law. Of the cases referred to above, *Hart* (11 Cal.2d 89, 92) and *National Brass Works* (92 Cal.App. 318, 322) suggest that participation in proceedings before the referee or trial court may constitute a waiver of objections. (See also *City of Los Angeles* v. *Cole* (1946) 28 Cal.2d 509, 514-516 [170 P.2d 928]; *Shain* v. *Peterson* (1893) 99 Cal. 486, 488 [33 P. 1085]; *Joshua Hendy Machine Works* v. *Pacific Cable Constr. Co.* (1893) 99 Cal. 421, 423 [33 P. 1084]; *Rosati* v. *Heimann* (1954) 126 Cal.App.2d 51, 54-55 [271 P.2d 953]; *Garland* v.

*Smith* (1933) 131 Cal.App. 517, 524-525 [21 P.2d 688]; *Grunsky* v. *Field* (1905) 1 Cal.App. 623, 625-626 [82 P. 979].)

 Appellants insist that the action of the court was null and void and no stipulation, failure to object below, or participation in the proceedings could confer jurisdiction. In *People* v. *Workman* (1936) 7 Cal.2d 176 [59 P.2d 1005], a second trial, held while an appeal from the order granting a new trial was still pending, was ruled to be beyond the jurisdiction of the court and the second judgment was reversed. In *Thompson* v. *Municipal Court* (1958) 162 Cal.App.2d 676 [328 P.2d 514], the judge purported to make a reference to his clerk by telephone. The court held that the telephonic order was a nullity and that the appellant's participation in the proceedings could not give it validity or constitute a waiver. *Shain* v. *Peterson* and *Garland* v. *Smith, supra,* were distinguished on the grounds that the lack of consent to a valid order was a mere irregularity; whereas in *Thompson* v. *Municipal Court* there was no order at all. In the present case, however, we have a court with jurisdiction over the parties and the subject matter. It would have been competent for the parties to expressly agree to set aside the reference and request the court to determine the case upon the evidence presented before the referee, and this is what they in effect did by their conduct.

 Furthermore, it is noted that in any event the court had power to review the matter on motion for new trial even if it were a general reference. (*Calderwood* v. *Pyser, supra,* 31 Cal. 333, 338; *Cappe* v. *Brizzolara* (1862) 19 Cal. 607, 608.) The premature filing and ruling on a motion for a new trial cannot be attacked by one who stipulated to the ensuing retrial and participated therein. (*City of Los Angeles* v. *Cole, supra,* 28 Cal.2d 509, 514-516.) So here, although judgment had not been entered on the referee's findings, the parties in submitting the referee's findings and conclusions to the trial court for review in the light of all the evidence were in effect stipulating to a new trial by the court on the evidence theretofore submitted.

 Finally, if the findings of fact of the referee be considered as a special verdict (Code Civ. Proc., § 645), the provisions of section 663 of the Code of Civil Procedure[7] come into play, and the court has power to set aside and vacate any

---

[7]Code Civ. Proc., § 663, provides: "A judgment or decree, when based upon findings of fact made by the court, or the special verdict of a jury, may, upon motion of the party aggrieved, be set aside and vacated by the same court, and another and different judgment entered, for

judgment predicated thereon and enter another and different judgment where the judgment or decree is not consistent with or not supported by facts so found. (For recognition of the power, see *San Francisco* v. *Superior Court* (1928) 94 Cal. App. 318, 322 [271 P. 121].) If an appellant may waive or be estopped to raise objections to rulings arising from a premature motion for new trial, the same considerations should apply to proceedings which in their nature are aimed to set aside erroneous conclusions of law.

In short, the appellants cannot herein attack the procedure which led to the entry of the court's findings of fact and conclusions of law, and further inquiry must be addressed to the merits of the case.

### Respondents' Legitimation by Decedent's Father

Respondents in order to sustain the judgment must not only show that they are brothers (Prob. Code, § 225) of the half blood (*id.* § 254) of the decedent, but also overcome the prohibition that an "illegitimate child . . . does not represent his father by inheriting any part of the estate of the father's kindred, either lineal or collateral, unless" he is legitimated (*id.* § 255). Section 255 of the Probate Code and sections 215 and 230 of the Civil Code provide alternate methods by which such status may be acquired. (*Estate of Garcia* (1949) 34 Cal.2d 419, 421 [210 P.2d 841]; *Estate of Peterson* (1963) 214 Cal.App.2d 258, 265 [29 Cal.Rptr. 384]; *Darwin* v. *Ganger* (1959) 174 Cal.App.2d 63, 70 [344 P.2d 353]; *Estate of Barton* (1949) 94 Cal.App.2d 919, 920 [212 P.2d 18]; *Wolf* v. *Gall* (1916) 32 Cal.App. 286, 290 [163 P. 346].) Respondents cannot show a marriage of their parents under the Probate Code section or section 215 of the Civil Code, but they claim and the trial court found, that they were legitimated pursuant to the provisions of section 230 of the Civil Code.[8]

---

either of the following causes, materially affecting the substantial rights of such party and entitling him to a different judgment:

"1. Incorrect or erroneous conclusions of law not consistent with or not supported by the findings of fact; and in such case when the judgment is set aside, the conclusions of law shall be amended and corrected.

"2. A judgment or decree not consistent with or not supported by the special verdict."

[8]See footnote 2, *supra.* "[t]he verb 'adopts,' as used in section 230, is used in the sense of 'legitimates,' and that the acts of the father of an illegitimate child, if filling the measure required by that statute, would result, strictly speaking, in the legitimation of such child, rather than in its adoption. Adoption, properly considered, refers to persons who are strangers in blood; legitimation, to persons where the blood relation exists." (*Blythe* v. *Ayres, infra,* 96 Cal. 532, 559; and see *Estate of Lund, infra,* 26 Cal.2d 472, 492.)

Appellants insist that the provisions of the last-mentioned section cannot be given extraterritorial effect, and that respondents' status as legitimate or illegitimate half-brothers of the decedent must be established by Italian law. Insofar as their status under Italian law may be different from their status for purpose of inheritance under California law, the effect thereof on any right they might otherwise have to inherit under California law, will be hereinafter discussed. The present inquiry is directed to the power and right of this state to determine the persons entitled to inherit property under its jurisdiction and the extent and manner in which that power has been exercised.

Three cases have given some extraterritorial effect to the provisions of section 230 of the Civil Code in resolving questions of inheritance. In *Blythe* v. *Ayres* (1892) 96 Cal. 532 [31 P. 915, 19 L.R.A. 40], of the five justices participating in the case, all agreed that there had been an acknowledgment pursuant to provisions of law similar to those presently contained in Probate Code section 255. (96 Cal. at pp. 581- 595.) The majority opinion which was concurred in by three of the justices found that the provisions of section 230 of the Civil Code were applicable to the decedent's illegitimate daughter who was born in England and remained there with her mother until after his death. The opinion concludes: "Legitimation is the creature of legislation. Its existence is solely dependent upon the law and policy of each particular sovereignty. The law and policy of this state authorize and encourage it, and there is no principle upon which California law and policy, when invoked in California courts, shall be made to surrender to the antagonistic law and policy of Great Britain. . . . And we say here, plaintiff was the child of Blythe, who was a domiciled citizen of the state of California. She founds her claim upon the statutes of this state, and is now here invoking the jurisdiction of the courts of this state. It is a question of California law to be construed in California courts, and we see nothing in our constitution or statutory law, or in international law, to have prevented Blythe from making the plaintiff his daughter in every sense that the word implies. In conclusion, we hold that Blythe being domiciled in the state of California both at the time of the birth of plaintiff and at the time he performed the acts which it is claimed resulted in the legitimation of plaintiff, and California law authorizing the legitimation of bastards by the doing of certain acts, it follows that Florence Blythe, the plaintiff, at all times was possessed

of a capacity for legitimation, under section 230 of the Civil Code of this state.'' (96 Cal. at pp. 575-576.)

In *Wolf* v. *Gall, supra,* 32 Cal.App. 286 the respondent children claimed the right to inherit from their paternal grandmother through right of representation of their deceased father. Although born out of wedlock they claimed and the trial court found ''that the subsequent marriage of their parents legitimated them by virtue of the provisions of section 215 of the Civil Code, and that their adoption by their father into his family in connection with such marriage also had for its effect their legitimation under section 230 of the same code.'' (32 Cal.App. at pp. 287-288.) The court extended the rule of *Blythe* v. *Ayres* to a situation where the acknowledging father ''had at all times concerned been an alien domiciled in Guatemala, and . . . [where] it was in Guatemala that the legitimating acts occurred.''[9] The court stated: ''Nor do we think that the fact that Wolf was an alien and domiciled outside of California renders ineffectual the acts claimed to result in the legitimation of respondents. ▮ While it is generally true that the laws of one state or country have no extraterritorial effect, on the other hand, when the status of a person is under consideration before the courts of this state in questions of succession, they will apply our own statutes in determining the status of the claimant to the succession; and if the claimant shows that by applying our law he is entitled to take as a legitimate child, it is sufficient, and the fact that by the law of his own country he is not legitimate is immaterial. In the case of *Blythe* v. *Ayres,* 96 Cal. 532, 564 [31 P. 915, 19 L.R.A. 40], the plaintiff was an illegitimate alien and at all times domiciled beyond the jurisdiction of California, and claimed to succeed to the estate of her intestate father by reason of having become legitimated by acknowledgment on his part in accordance with the provisions of section 230 of the Civil Code. In upholding her claim the court said: 'Our statute, conjoined with principles of international law, would have changed her bastardy to legitimacy in the world at large; and regardless of international law, and regardless of all law of foreign countries, our statute law alone would have made her legitimate in the world at large *whenever and however that question should present itself in the courts of California.'* '' (32 Cal.App. at pp. 288-289; italics the court's.)

---

[9] As recited in *Estate of Lund, infra,* 26 Cal.2d 472, 487. Limiting language of the Supreme Court in denying a hearing in *Wolf* was disapproved in *Estate of Garcia, supra,* 34 Cal.2d 419, 422.

*Estate of Lund* (1945) 26 Cal.2d 472 [159 P.2d 643, 162 A.L.R. 606] invoked the right of inheritance, as pretermitted heir, of an illegitimate son of the decedent who was received into his father's family with the consent of his father and the latter's wife while they were domiciled in another state, and was subsequently there publicly acknowledged and in every respect treated by his father as a legitimate son. The court lists five different theories for determining the jurisdiction of which the laws should govern in the attainment of the status of legitimacy,[10] reviews the general policy of the law regarding illegitimacy and more particularly the public policy of this state. The opinion then turns to the question of legitimation under section 230 of the Civil Code, rejects an asserted general rule that legitimation by acknowledgment or other act must be determined by the law of the domicile of the father at the time of the act, states that each state may formulate and apply its own policy in regard to legitimation, and approves and follows *Wolf* v. *Gall, supra,* and the principles enunciated in *Blythe* v. *Ayres, supra.* As an alternative ground the court distinguished between the *legal* significance of certain conduct which might vary with the jurisdiction which reviewed it, and the *factual* significance of the conduct which existed wherever the parties might be, and to which this state was free to give such legal significance as it deemed proper. ▮ The court stated: "We are satisfied that the public, unconditional, and long continued acknowledgment of a child by his father, with full knowledge of the facts, accompanied by reception of the child into the family and treatment as a legitimate child, constitutes a continuing representation to the whole world of a permanent de facto family status which is the very essence of the requirements of section 230 of our Civil Code; that such representation is of a fact which by its nature is inherently permanent and continuing and goes with the father wherever he goes. The factual significance of the father's acts, proclaimed to the whole world, was the same in California as in Minnesota or New Mexico. The fact that the legal effect of those acts may have been inconsequential in Minnesota and New Mexico is immaterial in California. When Andrew Lund came

---

[10]". . . (1) the law of the domicile of the father at the time of the birth of the child; (2) the law of the domicile of the father at the time of his legitimating acts; (3) the law of the place where the legitimating acts occurred; (4) the law of the domicile of the child (of its mother) at birth; (5) the law of the situs of property, succession to which depends on the status of legitimacy in that jurisdiction." (26 Cal.2d at p. 478.)

here and established his domicile he did so in the light of the factual significance of his previous acts. His conduct in California in remaining silent in respect to the facts surrounding the birth of petitioner is consistent with his prior acts and amounts to a continuing representation of the facts and de facto status which he had publicly proclaimed. His acts were, it is repeated, inherently of a permanent and continuing character. The biological relationship of father and son, and the de facto family relationship which the father had established, are not transient or volatile things which may exist one moment and be nonexistent the next, or which depend for their continuance upon repetitions of the original words or acts. Once proclaimed and established they exist as facts for all time and in all places. And when the living proclaimer of those facts comes to California and establishes his domicile herein and leaves estate to be distributed according to our laws of succession, the courts of California need not ignore those facts and are not powerless to apply them. Their legal effect within this state will be admeasured by the laws of this state.'' (26 Cal.2d at p. 496.)

The last rule is self-limiting to the situation where the father comes into this state and leaves his estate to be distributed according to the laws of this state. Should it be applied to the situation presented by this case where neither father nor illegitimate child has ever become domiciled here, and the sole incident of local jurisdiction is the legitimate son and his estate? *Wolf* v. *Gall, supra,* implies it should. There the father and children and the acts of acknowledgment were all outside of the state and the sole interest of California was in the resident paternal grandmother and her estate. In *Lund* the court states: ''Likewise it must be accepted as true that once a child has been received into the family of its father, *it attains the de facto status of a member of that family,* and unless disavowed, such status (in a broad sense) continues with it for the remainder of its days. The word 'family' means not merely those who live in one house but, in equally wide usage, signifies all who are descended from a not too distant common progenitor. (Webster's New Int. Dict. (2d ed.)) Here the petitioner was received into the intimate family circle, the household itself; he became as much a member of the family as was his half-brother Frank or his half-sister Blanche. That de facto status of family relationship is affirmatively shown to have continued during all the years of

the family's residence in Minnesota and in New Mexico. It is not shown to have ever been disavowed or terminated. So firmly established, it became a continuing factual status, which was attached to and went with the family and *each of its members.*" (26 Cal.2d at pp. 494-495; second italics added.) The court recognized that the de facto status accompanied the otherwise illegitimate son and the father wherever they went. It is concluded that it is logical and proper to follow *Wolf* and the path pointed out by *Lund.* ▪ Respondents are entitled to show their de facto status as members of the family of the decedent and his father, and to inherit if such status reflects legitimation within the provisions of section 230 of the Civil Code.

▪ The section first refers to, "The father of an illegitimate child. . . ." Both the referee and the trial court found, and the evidence clearly shows that respondents were the natural sons of decedent's father. The official birth records do not preclude showing this fact. They reflect that until 1907, and all during the period during which occurred the acknowledging acts upon which respondents rely, the respondents were considered as the illegitimate sons of Maddalena and a fictitious father. Similarly there can be no question but that the common father publicly acknowledged respondents as his sons, received them as such into his family and otherwise treated them as if they were legitimate children. The trial court expressly so found, and the referee found that the father, respondents, their mother, and the decedent lived together as a family. The evidence is overwhelming that the father publicly acknowledged and treated the respondents as his sons.

As noted above, the referee concluded that in any event the requirements of section 230 of the Civil Code were not met because the common father was married to Giovanna Zeni—and she never consented to the reception of respondents into his family. ▪ Although criticized[11] it is the law of this state that where a husband and wife are separated he cannot by setting up a second family and receiving natural children therein, legitimate the latter without the wife's consent. (*Adoption of Graham* (1962) 58 Cal.2d 899, 906 [27 Cal.Rptr. 163, 377 P.2d 275]; *Hurst* v. *Hurst* (1964) 227 Cal.App.2d 859, 864-865 [39 Cal.Rptr. 162]; *Darwin* v. *Ganger, supra,* 174 Cal.App.2d 63, 70-73; *Laugenour* v. *Fogg* (1942) 48 Cal.

---

[11]2 Armstrong, California Family Law, page 939; *McDaniel* v. *Fleming* (D.C.S.D. Cal. 1959) 172 F. Supp. 153, 156.

App.2d 848 [120 P.2d 690].) The reasoning of these cases does not necessarily support the thesis that the consent should be required where the wife has deserted the husband. The cases, however, insist on a literal interpretation of the provisions of the statute, and *Laugenour,* in disregard of canonical, or, in other jurisdictions, civil proscriptions on divorce, suggests it as remedy where the father is the wronged party. (48 Cal.App.2d at p. 852.)

It is unnecessary, however, to qualify or distinguish the foregoing cases to support the judgment herein. The trial court found that Giovanna left her place of residence and abandoned her husband and son immediately after the latter's birth and prior to 1888, and that she was never heard from again. It concluded as a matter of fact and as a matter of law that she died prior to 1905 and was dead at the time the acts of acknowledgment took place. The referee, however, found that she left subsequent to the decedent's birth and that the evidence failed to reveal her whereabouts thereafter. He concluded as a matter of fact and as a matter of law that the evidence did not establish her death prior to 1906.

The evidence offered as to Giovanna's whereabouts following the birth of decedent is as follows: A record from Napa State Hospital which reflects that the decedent stated on his admission November 3, 1947, as part of his family history, that ". . . his mother died when he was five years old"; a town record of the family situation on the death of decedent's father in 1905 which lists Giovanna as wife, the decedent as son, Maddalena as cohabitant, and lists respondents and their three deceased sisters also as cohabitants; affidavit of four townspeople, the oldest of whom was born in 1882, which recites that the father "after having been abandoned by his legitimate wife Zeni Giovanna," etc.; and an affidavit of the parish priest which recites: "1. When did Antonio Bassi (father of Paul) leave his wife Mrs. Giovanna Zeni? Answer: From the archives and registers of the Status of Persons (census) existing in the Parish it results that it was Mrs. Zeni Giovanna who abandoned her husband Bassi Giacomo Antonio and her son Paolo, and this occurred in or about the year 1885.

"2. For what length of time did he live with Miss Zappaterra? Answer: For 18 (eighteen) years; that is from 1886 to 1904.

"3. Was Giovanna Zeni alive during the time that he lived with Miss Zappaterra? Answer: Nothing definite exists or

results in this regard.'' In addition the respondents offered certificates of entries in and copies of the register of status of persons kept for the parish of Ficarolo for numerous years during the period from 1888 to 1904. These documents refer to Giovanna as follows: ''left by his wife who came from the Tyrol'' (1888-1889) ; ''separated from his wife who emigrated to Tyrol'' (1890) ; not mentioned (1892, 1893, 1894 and 1896) ; ''separated from his wife'' (1899, 1900, 1901, 1903) ; not mentioned (1904).

The respondents themselves testified that as a matter of family history Giovanna Zeni disappeared immediately after the birth of the decedent and nothing further was ever heard of her; that she was said to have died, perhaps drowned, but no evidence to prove this was found, notwithstanding subsequent investigations; that the investigations were conducted at her home town but nobody ever heard of her again; that she disappeared from the face of the earth and no one ever heard of her living or dead; that on his deathbed decedent's father sought to marry respondents' mother but was refused by the priest because there was no official evidence of Giovanna's death.

It also appears that although appellants had extensive investigation made of the nature and status of decedent's maternal relatives nothing further was disclosed about his mother other than her birth October 25, 1843, in Andolo in the province of Trento.

The referee in his report concluded that no evidence was offered on the existence or nonexistence of Giovanna from the time when she left decedent's father shortly after the former's birth, and that no showing was made that she was dead during the period of the alleged legitimation from 1888 to 1905. He applied a ''presumption of continued life,'' and found that she outlived decedent's father. The trial court properly sustained the objections to the referee's findings of fact and conclusions of law which so ruled.

Without reviewing the admissibility of each element of the proffered evidence referred to above, it is only necessary to state that the evidence admitted without objection is sufficient to establish, as originally found by the referee, that Giovanna left, and that her whereabouts thereafter are not revealed. On this state of the record the trial court properly applied the provisions of subdivision 26 of section 1963 of the Code of Civil Procedure which creates a disputable presumption ''That a person not heard from in seven years is dead.'' (*Pacific Gold Dredging Co.* v. *Industrial Acc. Com.* (1920) 184 Cal.

462, 467 [194 P. 1, 13 A.L.R. 725]; *Estate of Ross* (1903) 140 Cal. 282, 286-288 [73 P. 976]; *Kaufmann* v. *New York Life Ins. Co.* (1919) 44 Cal.App. 313 [186 P. 360]; *Brown* v. *Grand Lodge A.O.U.W.* (1910) 13 Cal.App. 537, 538 [110 P. 351]; and see *Estate of Christin* (1933) 128 Cal.App. 625, 627-628 [17 P.2d 1068].) ▮ The rule that one once shown to be alive continues alive until proven dead (see Code Civ. Proc., § 1963, subd. 32) yields to the seven-year presumption. ▮ "The law also presumes the existence of a person once established by proof to continue until the contrary is shown, or until a different presumption arises. 'Thus, where the issue is upon the *life* or death of a person once shown to have been living, the burden of proof lies upon the party who asserts the death. But after the lapse of seven years, without intelligence concerning the person, the presumption of life ceases, and the burden of proof is on the other party.' (1 Greenl. Ev. § 41.)" *(People* v. *Feilen* (1881) 58 Cal. 218, 221 [41 Am.Rep. 258]; and see *People* v. *Stokes* (1886) 71 Cal. 263, 266-267 [12 P. 71]; *Ashbury* v. *Sanders* (1857) 8 Cal. 62, 64 [68 Am. Dec. 300]; and *Estate of Newman* (1939) 34 Cal.App.2d 706 712 [94 P.2d 356].)[12] ▮ It is suggested that before the presumption can apply there must be proof that diligent effort has been made to locate the absentee. (See *Kaufmann* v. *New York Life Ins. Co., supra,* 44 Cal.App. 313, 315; *Brown* v. *Grand Lodge A.O.U.W., supra,* 13 Cal.App. 537, 538; 15 Cal. Jur.2d 84, Death, § 7; Note 99 A.L.R.2d 310.) The application of such a test, however, would appear to depend on the circumstances. "The circumstances surrounding the disappearance of one, together with additional facts relating to his relationship to others, may be such that persons interested in establishing the fact of death of the missing person may not be required to make any endeavor to ascertain his whereabouts." *(Estate of Christin, supra,* 128 Cal.App. 625, 629.) ▮ Under the circumstances here it may well be assumed that the absent spouse, if alive, would be the one to inquire about her husband and son. (Cf. *Estate of Harrington* (1903) 140 Cal. 244, 249 [73 P. 1000, 98 Am.St.Rep. 51] and *Estate of Perry,*

---

[12]*Feilen, Ashbury* and *Newman* all recognize that even the presumption of continuance of life for seven years must yield to the presumption of innocence. (See also Code Civ. Proc., § 1963, subd 1; *Brooms* v. *Brooms* (1957) 151 Cal.App.2d 343, 349 [311 P.2d 562]; *Wilcox* v. *Wilcox* (1916) 171 Cal. 770, 773-777 [155 P. 95]; and *Hunter* v. *Hunter* (1896) 111 Cal. 261, 267-269 [43 P. 756, 52 Am.St.Rep. 180].) This suggests that under certain circumstances the strong policy enunciated in *Estate of Lund* (1945) 26 Cal.2d 472 [159 P.2d 643, 162 A.L.R. 606], might dictate similar consequences in order to effect legitimation.

(1922) 58 Cal.App. 420, 425 [208 P. 987].) It would be unreasonable to expect direct proof of such inquiries after the death of decedent at a time at least 70 years after his mother's disappearance. In any event, the record is replete with secondary evidence that those interested desired to but were unsuccessful in determining her existence or nonexistence. On this state of the record the presumption is applicable.

The presumption being in the case, the burden shifted to appellants to overcome it. (*Valentine* v. *Provident Mut. Life Ins. Co.* (1936) 12 Cal.App.2d 616, 618 [55 P.2d 1243]; and see *People* v. *Stokes, supra,* 71 Cal. 263, 267.) In the absence of such evidence the referee's finding, contrary to the presumption, was erroneous and was properly vacated.

A return to a consideration of the application of section 230 of the Civil Code reflects, as noted above, ample evidence of compliance with its provisions. Since the evidence fails to show that the decedent's father's wife survived during the period he acknowledged respondents as his sons there can be no requirement of her consent. (See *Estate of Mc-Namara* (1919) 181 Cal. 82, 97-98 [183 P. 552, 7 A.L.R. 313]; *Estate of Jones* (1913) 166 Cal. 108, 112-116 [135 P. 288]; *Estate of Gird* (1910) 157 Cal. 534, 542-545 [108 P. 499, 137 Am.St.Rep. 131]; *Hurst* v. *Hurst, supra,* 227 Cal.App.2d 859, 868-870; *Estate of Abate* (1958) 166 Cal.App.2d 282, 285-291 [333 P.2d 200]; *Serway* v. *Galentine* (1946) 75 Cal. App.2d 86, 90-91. [170 P.2d 32].) The factual status between the father, the decedent, and respondents having once been established, it followed the decedent to California. The respondents are entitled to inherit through their father, not only as heirs of his estate if he had died here, but also from their half-brother or other paternal relatives who do leave estate here. (*Estate of Garcia, supra,* 34 Cal.2d 419 (paternal aunt); *Estate of Barton, supra,* 94 Cal.App.2d 919 (legitimate half-sister); *Estate of Esposito* (1943) 57 Cal.App.2d 859 [135 P.2d 167] (paternal grandfather); and *Wolf* v. *Gall, supra,* 32 Cal.App. 286 (paternal grandmother).)

### The Effect of the Stepfather's Acknowledgment

Appellants insist that the status of respondents as legitimate or illegitimate can only be determined by Italian law; that under that law they are the natural or legitimated sons of their stepfather, and entitled to inherit from him; and that a fortiori they cannot inherit from the decedent through their mutual father. It is unnecessary to determine whether the acknowledgment made by the stepfather in Italy is of

import similar to the provisions of section 230 of the Civil Code which are limited to acknowledgments by a natural father to the exclusion of a stepfather (*Clevenger* v. *Clevenger* (1961) 189 Cal.App.2d 658, 665 [11 Cal.Rptr. 707, 90 A.L.R. 2d 569]); or whether such formal acknowledgment as has been evidenced by the declaration of the mother and stepfather, and the marginal notes on the respondents' birth certificates, may be collaterally attacked or can only be directly attacked to show that the declarant was not in fact the natural parent.

It was pointed out in *Blythe* v. *Ayres, supra,* that a person may have different status in different countries. The opinion states: "Neither is the rule universal that a child legitimate in one country is legitimate in all the world. This principle of different *status* in different countries finds a striking illustration in Lolly's case, reviewed and dissented from by Lord Brougham in *Warrender* v. *Warrender*, 2 Clark & F. 539. In that case the facts disclosed that Lolly was married in England, divorced in Scotland, and upon his return to England and making a second marriage, he was then tried and convicted of bigamy. Here we have a state of facts where, under the respective laws of England and Scotland, Lolly, after his divorce and prior to his second marriage, was a married man in England and an unmarried man in Scotland, and after his second marriage he had a lawful wife in Scotland and a different lawful wife in England, thus having two lawful wives at the same time. It can hardly be said that Lolly's status was the same in both countries. A similar principle is applied to the legitimacy of children by subsequent marriage. The provisions of section 215 would operate upon and legitimate a child born of a father who, at the time of its conception and birth, was the husband of another woman, or would apply to an incestuous bastard. Such was expressly declared to be the law under a similar provision of a state statute in the case of *Hawbecker* v. *Hawbecker,* 43 Md. 516, the court saying: 'No doubt, the legislature, in thus mitigating the severe rule of the common law, intended to hold out to the sinning parents an inducement to marry, and thus put a stop to the mischiefs of further illicit intercourse between them, *but, in our opinion, the main purpose and intent of the enactment we are now considering was to remove the taint and disabilities of bastardy from the unoffending children whenever their parents did marry, without regard to the deepness of guilt on the part of their*

*parents in which they were conceived and born.'* Such a child, under the canon law, would be deemed an adulterine or incestuous bastard, incapable of legitimation, and in the courts of certain countries where that law controls would not be recognized as legitimate. Thus is presented a case, and by no means an anomalous one, where the child would be legitimate in California, and illegitimate by the laws of various other countries. (See Fraser on Parent and Child, 56, subd. 10.)'' (96 Cal. 532, 569-571.)

In *Estate of Lund, supra,* the same concept is recognized. ''It is obvious that the question with which we are dealing is one of comity, and is not controlled by the constitutional provision as to 'full faith and credit.' Thus, in *Olmsted* v. *Olmsted* (1910) 216 U.S. 386, 395 [30 S.Ct. 292, 54 L.Ed. 530, 25 L.R.A. N.S. 1292], the United States Supreme Court held that (as well epitomized in the annotation at p. 942 of 73 A.L.R.) 'the courts of one state are not required by the full faith and credit clause of the federal Constitution to give effect to the statute of another state legitimizing children born prior to the marriage of their parents, so as to control the devolution under a will of the title to lands in the state, particularly where to give effect to such statute would disturb interests already vested when the statute was enacted.' Of course it is obvious that if a state is not bound to recognize a status of legitimacy created in another state it is not obligated to leave unchanged a status of illegitimacy existing in such other state.

''We deem it uncontestable that each state may formulate its own public policy in respect to legitimation and can enact laws to carry out its policy. There is no federal constitutional proscription against a state's adopting legislation which makes legitimate within the operation of its laws children who are illegitimate in other jurisdictions nor is there any constitutional requirement that such laws be limited in .their applicability to children who were born in the state or whose parents (either or both) were domiciled in the state at the time of their birth or that such laws be dependent for operation on acts occurring within the state.

''In the annotation at page 666 of Lawyers Reports Annotated 1916E the conclusion is stated that 'Whether acts of recognition in a different jurisdiction will be effective seems to depend upon the requirements of the particular statute of the jurisdiction where the suit involving the question of recognition occurs.'

"It will be noted that in none of 'the legitimation provisions of the California law hereinabove quoted is there any express or apparent requirement that the precedent marriage, void or otherwise, has been solemnized in California; or that the child of the marriage, void or otherwise, has been born in California; or that the parents, or either of them, or the child, at any time have been domiciled in California; or that the subsequent marriage of the parents of an illegitimate child be contracted in California; or that the legitimating acts specified in section 230, occur in California." (26 Cal.2d 472, 485-486; and see *Wolf* v. *Gall, supra,* 32 Cal. App. 286, 289.)

There is nothing inherently improper in conferring a right to inherit from two separate paternal stocks. Prior to the amendment of section 257 of the Probate Code in 1955 an adopted child would inherit from the collateral relatives of his natural father and as well from his adoptive father.[13] (*In re Darling* (1916) 173 Cal. 221, 223-228 [159 P. 606]; *Estate of Esposito, supra,* 57 Cal.App.2d 859, 866; and cf. *Estate of Serventi* (1961) 190 Cal.App.2d 514 [12 Cal.Rptr. 206].) So here there is nothing which precludes the application of the laws of succession of this state, as interpreted in the light of the local statutes and policy governing the determination of legitimacy, so as to permit inheritance by admitted half-brothers whose factual status makes them legitimate sons of the mutual father under this law, even though at their domicile they may be considered the legitimate sons of another and entitled to inherit from him, and even though under the law of this state they might inherit from their stepfather on his declaration.[14]

The judgment is affirmed.

Sullivan, P. J., and Molinari, J., concurred.

A petition for a rehearing was denied June 17, 1965, and appellants' petition for a hearing by the Supreme Court was denied July 14, 1965.

---

[13]It should be noted that it is not claimed that the proceedings taken by the stepfather in Italy constituted an adoption. Admittedly other proceedings are necessary to accomplish that status.

[14]Prob. Code, § 255 refers to "the person who, in writing, signed in the presence of a competent witness, acknowledges himself to be the father. . . ." If this person may be other than the natural father (cf. *Clevenger* v. *Clevenger* (1961) 189 Cal.App.2d 658, 665 [11 Cal.Rptr. 707, 90 A.L.R.2d 509], and second half of section 255 which refers to "his father") the result indicated could obtain.