Filed 12/28/22

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| SHANNON WEHSENER, | D079623 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2018-00032047-PR-LA-CTL) |
| WENDY JERNIGAN, | |
| Objector and Respondent. | |

APPEAL from an order of the Superior Court of San Diego County, Jeffrey Bostwick, Judge. Affirmed.

Hughes & Pizzuto, Anne M. Rudolph and Ralph E. Hughes for Plaintiff and Appellant.

Beamer, Lauth, Steinley & Bond and Phillip A. Bond for Objector and Respondent.

## INTRODUCTION

In this case, we must decide whether Judith Scherber (Judy)[1] is an intestate heir of Loch David Crane (Decedent), who died in 2018 while domiciled in San Diego County. Judy's petition is based on her relationship with Charles Bloodgood (Charles). In 1951, Charles and his wife Frances Bloodgood (Frances) took two-year-old Judy into their home after she was abandoned by her birth parents, and for the duration of their lifetimes, held Judy out as their own child while domiciled in Indiana.

Probate Code[2] section 6453 provides the rules for determining who is a "natural parent" for purposes of intestate succession, and it includes a presumed parent-child relationship under the Uniform Parentage Act (UPA) (Fam. Code, § 7600 et seq.). (§ 6453, subd. (b)(2).) Applying California law to undisputed facts jointly submitted by the parties, the probate court found Judy was the presumed natural child of Charles under the UPA; that Shannon Wehsener (Shannon), a first cousin of Decedent who had opposed Judy's petition, had failed to proffer any facts to rebut that presumption; and that Judy therefore was Decedent's heir through Charles, based on Charles openly holding her out as his own child during his lifetime.

On appeal, Shannon argues the probate court erred in applying California law to determine the existence of a natural parental relationship between Charles and Judy. Shannon argues the court instead should have

---

[1] Judith died in January 2022, during the pendency of this appeal. Her daughter, Wendy Jernigan, has substituted into this action as the personal representative of Judith's Indiana estate. For convenience, we will, as the parties have, refer to Judith and her estate collectively as "Judy."

[2] Unless otherwise indicated, all further statutory references are to the Probate Code.

applied Indiana law, where that relationship was effectuated. And unlike California, Indiana law does not recognize the existence of a natural parent and child relationship for purposes of determining heirship when a parent openly holds out a child as that parent's own. Shannon further argues that even if California law applies and Charles is the presumed natural parent of Judy, that presumption was rebutted purely on the basis of public policy.

Exercising independent review, we conclude California law applies in determining parentage between Judy and Charles for purposes of intestate succession. Based on the undisputed facts, we further conclude clear and convincing evidence supports the probate court's finding that Charles was the presumed natural parent of Judy under the UPA; that Shannon did not meet her burden to produce clear and convincing evidence to rebut that presumption; and that the presumption cannot be rebutted purely on the grounds of public policy. We thus affirm the probate court's order that Judy, through Charles, is an intestate heir of Decedent.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Stipulated Facts*

The probate court decided the issues on appeal based upon the parties' stipulation of the following 17 undisputed facts:

"1.     The Decedent died on April 25, 2018, a resident of San Diego County, California, leaving assets to be administered in San Diego County.

"2.     The Decedent was not survived by spouse, issue, parents, issue [of] parents, or grandparents. Accordingly, the Decedent's intestate heirs are the issue of his grandparents.

"3.     [Shannon] is the Decedent's sole first cousin on his paternal side.

"4.     Shannon is the sole person entitled to share in any portion of the

3

estate passing by intestacy as issue of the Decedent's paternal grandparents.

"5.    [Charles] was the adopted brother of the Decedent's mother, CLARE BLOODGOOD CRANE.  Charles was a resident of Indiana and died on July 14, 1993, in Indiana.

"6.    Judy was born on April 6, 1949.  Her biological parents were Dorothy Sue Davenport and Henry Lee Hayden.  Judy's biological mother abandoned her and her biological father when Judy was an infant.  Judy lived with her biological father until she was two years old.

"7.    When Judy was two years old, Judy's biological father dropped her off with Charles and [Frances], who were then living in Kentucky, and asked them to babysit.  Judy's biological father never returned.  Judy continued to live in the home of Charles and Frances for the duration of her childhood.

"8.    When Judy was not more than eleven years old, Charles, Frances, and Judy moved to Indiana.  When Charles, Frances, and Judy moved to Indiana, Charles and Frances openly held Judy out to be their daughter.  School records from Indiana show that Judy was registered with the last name 'Bloodgood[,'] and as a child of Charles and Frances.  Charles and Frances continued to hold Judy out as their daughter for the remainder of their lifetimes.  The Last Will and Testament of Charles E. Bloodgood named Judy as Charles['s] daughter.

"9.    Judy is not Charles['s] or his wife's biological child, and there is no evidence she was legally adopted.  Thus, any purported relationship between Charles and Judy is based solely upon Charles having taken Judy into his home and having held Judy out as his daughter.  Charles and Frances knew that Judy was the biological child of another couple.

"10.    Although Charles and Frances took Judy into their home in

4

Kentucky, there is no evidence that Charles ever held Judy out as his child until they moved to Indiana. Thus, any purported parent-child relationship between Charles and Judy is based upon Charles having taken Judy into his home and having held Judy out as his daughter, and such purported relationship was established and maintained in Indiana.

"11. Because of his own negative experience in the foster care system, Charles chose not to initiate any action to legally adopt Judy. There is no evidence that there was any legal barrier preventing Charles from legally adopting Judy during his lifetime.

"12. Charles and Judy never lived in California.

"13. There is no evidence that Judy and the Decedent ever met.

"14. There is no evidence that Charles and the Decedent ever met.

"15. Shannon and the Decedent had a close relationship from childhood.

"16. Judy learned of the Decedent's death after being contacted by an heir search company.

"17. There is no evidence that Judy had any interaction or relationship with her biological parents after they left her in Charles['s] custody at age [two], with the exception of a single meeting between Judy and her biological father when Judy was 18 years old."

II.

*Procedural History and Additional Facts*

On June 27, 2018, Shannon filed a petition for letters of administration to administer the estate (Estate) of Decedent (Petition for Letters of Administration). The petition asserted Decedent died intestate. All known heirs were served with notice of the petition and notice was also published in

a newspaper of general circulation. Judy received notice of the petition in September 2018.

On November 13, 2018, the probate court appointed Shannon administrator of the Estate. Shortly thereafter, the court issued Shannon letters of administration with "full authority" to administer the Estate.

On January 8, 2020, Shannon filed her "First and Final Report of Personal Representative [and] Petition for Final Distribution" (Petition for Final Distribution). (Some capitalization omitted.) Shannon asserted distribution of the Estate should be made by intestate succession and that she was Decedent's sole heir.

On February 21, 2020, Judy (through her Indiana estate's personal representative) filed her "Response and Objection" to the Petition for Final Distribution (Response), claiming she also qualified as an heir of Decedent as the "natural (but not biological) child" of Charles; that Charles was the brother of Clare Bloodgood Crane, Decedent's mother; that Clare and Charles were the children of David W. Bloodgood and Elinor Bloodgood, maternal grandparents of Decedent; and therefore, that Judy, through Charles, was entitled to one-half of Decedent's Estate as issue of Decedent's maternal grandparents.

In addition to the undisputed facts in the parties' stipulation (previously summarized), Judy's Response also included copies of her 1968 marriage certificate, identifying Frances and Charles as her parents; and Judy's January 2022 death certificate, issued by the Indiana State Department of Health, which also identified Frances and Charles as her parents.

On February 2, 2021, Shannon filed a petition for probate of will (Petition for Probate) along with a request to be appointed administrator. In

6

the Petition for Probate, Shannon stated she found a holographic will dated June 1, 2007 (purported will) in Decedent's home, after she had filed the Petitions for Letters of Administration. One of the purported beneficiaries under the will, Save Our Heritage Organisation, also filed a petition for probate. Decedent's purported will has not been admitted to probate.

On May 4, 2021, the probate court bifurcated the issue of Judy's heirship claim from the remaining issues in the case and continued the petitions for probate of Decedent's purported will.

On July 9, 2021, Judy and Shannon submitted their stipulation of undisputed facts and their respective trial briefs. The probate court heard oral argument on July 16 and took the matter under submission. On August 16, the court announced its ruling from the bench and that same day issued a minute order providing it had made "detailed findings on the record" in support of its decision that Judy is an intestate heir of Decedent.

In reaching its decision, the probate court found (1) California law applied in determining, for purposes of intestate succession, the legal status of the relationship between Charles and Judy; (2) Charles was the presumed natural parent of Judy as a result of him openly holding her out as his own child during his lifetime; and (3) Shannon proffered "no facts" to rebut the presumption. Shannon timely appealed.

DISCUSSION

I.

*California Law Governs the Determination of Parentage for Purposes of*

*Intestate Succession*

A.    *Standard of Review*

This case involves an heirship claim based on undisputed facts that requires application of various statutes, including those defining the meaning

7

of parent and child and whether a natural parent and child relationship exists. (See *Estate of Britel* (2015) 236 Cal.App.4th 127, 135–136 (*Britel*).) The case therefore presents a question of law that we review de novo. (*A.S. v. Miller* (2019) 34 Cal.App.5th 284, 290 (*Miller*); *Estate of Bartsch* (2011) 193 Cal.App.4th 885, 891.) We also review de novo the probate court's decision to apply California and not Indiana law in determining parentage between Charles and Judy. (See *Brown v. Grimes* (2011) 192 Cal.App.4th 265, 274 [noting a trial court's choice-of-law ruling is reviewed de novo].)

B. *Guiding Principles*

" 'Intestate succession is governed entirely by statute.' [Citations.] 'The *heirs* of a person are those whom the law appoints to succeed at the decedent's death to his or her estate in case of intestacy, by virtue of the statutes of succession.' [Citation.] [¶] Section 6400 et seq. governs intestate succession. As relevant here, if there is no surviving spouse . . . of an intestate decedent, the intestate estate passes to the decedent's 'issue' . . . . ' "Issue" of a person means all his or her lineal descendants of all generations, with the relationship of parent and child at each generation being determined by the definitions of child and parent.' " (*Britel*, *supra*, 236 Cal.App.4th at p. 135.)

A threshold issue in this case is whether California or Indiana law applies to determine parentage between Charles and Judy for the purpose of determining whether she is an heir of Decedent. Judy claims California law applies as it has the power and right under its succession laws to determine who is an heir of a decedent who died intestate while domiciled in this state. Shannon, however, claims Indiana law applies because the relationship between Charles and Judy was effectuated in that state.

8

Here, we conclude California law applies to determine parentage when a person claims to be an heir of an intestate decedent who was domiciled in California when he or she died, even if, as in the instant case, the parent and child relationship was effectuated outside California. (See *Estate of Bassi* (1965) 234 Cal.App.2d 529 (*Bassi*).) We discuss *Bassi* in detail because it provides useful guidance on the issues presented in this case.

*Bassi* involved the heirship claims of Carlo and Umberto, two half-brothers of Paul. Paul died intestate in 1958 while domiciled in California. Carlo and Umberto were the nonmarital[3] children of Paul's father, Giacomo, and Giacomo's partner Maddalena. While living in Italy, Giacomo publicly acknowledged Carlo and Umberto as his own, and with Maddalena and Paul they "openly lived together as a family." (*Bassi, supra*, 234 Cal.App.2d at p. 534.) Giacomo passed away in Italy in 1905.

The petitioners in *Bassi* were the descendants of brothers and sisters of Giacomo. They claimed the California probate court erred by applying former Civil Code section 230[4] in finding that Carlo and Umberto were the legal

---

[3] Historically, the law has used the term "illegitimate" (or worse) to describe a child born to unwed parents. Like other courts, we instead prefer to use the term "nonmarital child." (See e.g., *Miller, supra*, 34 Cal.App.5th at p. 287, fn. 1.)

[4] At the time *Bassi* was decided, former Civil Code section 230 provided in part: " 'The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth.' " (*Bassi, supra*, 234 Cal.App.2d at p. 534, fn. 2, quoting former Civ. Code, § 230.) As we later discuss, in determining intestate succession California no longer uses the terms "legitimate" or "illegitimate" to describe the legal status of a person born to unwed parents.

9

heirs of Paul. The petitioners instead claimed the court should have applied Italian law, based on Giacomo's effectuation of the parent and child relationship in Italy; that under Italian law, no parental relationship was created; and therefore, Carlo and Umberto were not Paul's heirs. (*Bassi*, *supra*, 234 Cal.App.2d at p. 542.)

In rejecting the petitioners' argument, *Bassi* recognized that California had the "power and right . . . to determine the persons entitled to inherit property under its jurisdiction and the extent and manner in which that power has been exercised." (*Bassi*, *supra*, 234 Cal.App.2d at p. 542.) *Bassi* concluded that, once Giacomo acknowledged Carlo and Umberto as his own children and they openly lived together as a family in Italy, a parent and child relationship was created between them that Giacomo never disavowed, and that relationship then "followed the decedent [Paul] to California." (*Id.* at p. 550.) As such, *Bassi* held Carlo and Umberto were entitled to inherit through "their father, not only as heirs of his estate if he had died here [in California], but also from their half-brother or other paternal relatives who [have left an] estate here." (*Ibid.*)

In support of its holding, *Bassi* relied on a triad of cases that had given "extraterritorial effect" to California law in resolving questions of inheritance. (*Bassi*, *supra*, 234 Cal.App.2d at p. 542.)

The first case was *Blythe v. Ayres* (1892) 96 Cal. 532 (*Blythe*). In *Blythe*, the Supreme Court held under former Civil Code section 230 that a nonmarital child of the decedent was his heir despite the fact the child was born in England and remained in England until after the decedent's death in California. (*Blythe*, at pp. 575–576.)

In support of its holding, the Supreme Court reasoned the "law and policy" of California encouraged "[l]egitimation" of a child (*Blythe*, *supra*, 96

Cal. at p. 575); that no principle existed "upon which California law and policy, when invoked in California courts, shall be made to surrender to the antagonistic law and policy of Great Britain" (*ibid.*); that the determination of the child's status as an heir of the decedent did not depend on the law of England or whether that child was making a claim in an English court to property within its jurisdiction (*ibid.*); and that, because the child based her heirship claim upon California law and was "invoking the jurisdiction of the courts of this state," whether the child was an heir of the decedent became a "question of California law to be construed in California courts" (*id.* at pp. 575–576).

*Bassi* also relied on *Wolf v. Gall* (1916) 32 Cal.App. 286 (*Wolf*). There, nonmarital children sought to inherit from their paternal grandmother, claiming in part that their father "legitimated" them under former Civil Code section 230 by acknowledging them as his own children while the family lived together in Guatemala. (*Wolf*, at pp. 287–289, as discussed in *Estate of Lund* (1945) 26 Cal.2d 472, 487 (*Lund*); see *Estate of Garcia* (1949) 34 Cal.2d 419, 422 [disapproving of limiting language in *Lund* in denying rehearing in *Wolf*].) Relying on *Blythe* for support, *Wolf* held that the nonmarital children were heirs of the decedent. (*Wolf*, at p. 289.)

In reaching its decision, *Wolf* found the fact the decedent was "an alien and domiciled outside of California" did not render "ineffectual" his acts that "result[ed] in the legitimation of respondents" (*Wolf*, *supra*, 32 Cal.App. at p. 288); that "[w]hile it is generally true that the laws of one state or country have no extraterritorial effect, on the other hand, when the status of a person is under consideration before the courts of this state in questions of succession, they will apply our own statutes in determining the status of the claimant to the succession; and if the claimant shows that by applying our

11

law he [or she] is entitled to take as a legitimate child, it is sufficient, and the fact that by the law of his own country he is not legitimate is *immaterial*" (*id.* at pp. 288–289, italics added).

*Bassi* also relied on the Supreme Court's *Lund* decision. The petitioner in *Lund* claimed he was the nonmarital child and pretermitted heir of Andrew, who died testate in California. (*Lund*, *supra*, 26 Cal.2d at p. 475.) The petitioner was born in Norway and remained living in the country until, at Andrew's request, he moved to Minnesota to live with Andrew, Andrew's wife, and their two children. (*Id.* at pp. 475–476.) While domiciled in Minnesota and subsequently in New Mexico, the petitioner continued to live as a member of Andrew's family; and was publicly recognized and acknowledged by Andrew as a son, a relationship Andrew never disavowed. (*Id.* at p. 476.) Andrew subsequently moved to California and devised his estate to his other two children. (*Ibid.*) Applying former Civil Code section 230 and relying on *Blythe* and *Wolf*, the *Lund* court held the petitioner was entitled to share in Andrew's estate. (*Lund*, at p. 496.)

In reaching its decision, *Lund* rejected the argument that "legitimation" by acknowledgement must be determined by the law of the domicile of the father at the time of the act (i.e., Minnesota and/or New Mexico). (*Lund*, *supra*, 26 Cal.2d at p. 479.) Instead, California "may formulate [and apply] its own public policy in respect to legitimation" of a child (*id.* at pp. 485–486) and was free to give legal significance to conduct involving a nonmarital child " 'wherever located and wherever born' " (*id.* at p. 488); and that once a child had been "received into the family of its father, *it attains the de facto status of a member of that family,* and unless disavowed, such status (in a broad sense) continues with it for the remainder of its days" (*id.* at p. 494).

12

Similar to *Wolf*, the *Lund* court concluded the fact that the legal effect of Andrew's acts may have been inconsequential outside California was immaterial in determining parentage in California, reasoning: "When [the decedent] Andrew Lund came here and established his domicile he did so in the light of the factual significance of his previous acts. His conduct in California in remaining silent in respect to the facts surrounding the birth of petitioner is consistent with his prior acts and amounts to a continuing representation of the facts and de facto status which he had publicly proclaimed. His acts were, it is repeated, inherently of a permanent and continuing character. The biological relationship of father and son, and the de facto family relationship which the father had established, are not transient or volatile things which may exist one moment and be nonexistent the next, or which depend for their continuance upon repetitions of the original words or acts. Once proclaimed and established they exist as facts for all time and in all places. And when the living proclaimer of those facts comes to California and establishes his domicile herein and leaves estate to be distributed according to our laws of succession, the courts of California need not ignore those facts and are not powerless to apply them. Their legal effect within this state will be admeasured by the laws of this state." (*Lund, supra*, 26 Cal.2d at p. 496.)

C.    *Analysis*

Applying *Lund and Blythe*, as we must (see *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [trial and appellate courts must follow binding Supreme Court authority]), and relying on *Bassi* and *Wolf* for guidance, we conclude: (1) a California probate court will apply this state's laws in determining whether a legally cognizable parent and child relationship exists as a condition to an heirship claim; and (2) it is

13

immaterial whether another state or country, applying its own laws, would not recognize the existence of such a relationship effectuated in that state or country. Although we note that certain of these authorities date back more than 100 years, our independent research shows even today they remain good law and are most factually on point in the present action.

Shannon nonetheless argues the probate court should have applied Indiana law to determine parentage between Charles and Judy. For support, Shannon cites *Estate of Hart* (1984) 165 Cal.App.3d 392 (*Hart*) and *Estate of O'Dea* (1973) 29 Cal.App.3d 759 (*O'Dea*), among other authorities. Shannon further argues that under Indiana law,[5] Judy has no legally recognized parental relationship with Charles because she was neither his biological child nor legally adopted by him.[6]

*Hart* and *O'Dea* are factually and legally inapposite to the present case. Both cases involved collateral attacks in the probate court on adoption judgments rendered in a different state (*Hart*) or country (*O'Dea*) more than

---

[5] See e.g., *In re Estate of Fox* (1975) 164 Ind.App. 221, 222–223 [refusing to recognize the "doctrine of equitable adoption" to make a child who was not legally adopted an heir of a person who took the child into the family home at a very young age and raised the child as her own until majority; concluding that Indiana's laws of "descent and distribution" are "long standing and based upon the traditional relationships of marriage, blood, or adoption," and that there was "no compelling reason to create a judicial doctrine to serve the same purpose when the statutory schemes of probate or adoption seem quite adequate"]; Ind. Code, § 31-9-2-13(a) [" 'Child' . . . means a child or children of both parties to the marriage. The term includes the following: [¶] (1) Children born out of wedlock to the parties. [¶] (2) Children born or adopted during the marriage of the parties."].)

[6] Shannon separately requests this court take judicial notice of decisional and statutory law from Indiana. This request is denied as unnecessary because these authorities are already included in the appellate record.

14

25 years after the adoptions had been finalized, by individuals who sought to inherit from a birth parent.  Both cases also involved principles of comity that are inapplicable here, based on the rule that adoption status " 'is determined by the laws of the state in which the adoption was effected.' " (*Ehrenclou v. MacDonald* (2004) 117 Cal.App.4th 364, 375; *Hart*, *supra*, 165 Cal.App.3d at pp. 394–395, 397 [Oklahoma court in 1954 decreed then 16-year-old petitioner was legally adopted by his step-father, a determination that was upheld in 1982 by the Oklahoma Supreme Court and subsequently recognized in California under full faith and credit principles in determining that the petitioner was not an heir to his biological father's estate]; *O'Dea*, *supra*, 29 Cal.App.3d at pp. 773–775 [Canadian legislation and Canadian court decree that the petitioner's 1940 adoption was null and void under Canadian law recognized in California under comity principles, thus entitling the petitioner to claim an interest in her mother's California estate].)  Because it is undisputed that Charles never legally adopted Judy, neither decision has any application in the instant case.

Shannon also argues it is "illogical" for Judy to inherit "from Decedent *through* her purported relationship to Charles[,] when she could not even inherit *from* Charles" under Indiana law.  But here we are not concerned with the succession laws of Indiana, or any other state or country for that matter, but only the succession laws in California.  And, as noted by binding authority in *Lund* and *Blythe*, and by persuasive authority in *Bassi* and *Wolf*, it is immaterial for purposes of determining intestate succession in this state whether another forum would also recognize a parent and child relationship under that forum's laws.  (See *Lund*, *supra*, 26 Cal.2d at p. 496; *Blythe*, *supra*, 96 Cal. at pp. 575–576; *Bassi*, *supra*, 234 Cal.App.2d at p. 550; *Wolf*, *supra*, 32 Cal.App. at pp. 288–289.)

15

We conclude the question of parentage in resolving Judy's heirship claim is determined under California law, which we turn to next.

## II.

*A Natural Parent and Child Relationship Exists Between Charles and Judy*

A.    *Guiding Principles*

Sections 6450 through 6455 define "the parent-child relationship for purposes of intestate succession." (*Estate of Ford* (2004) 32 Cal.4th 160, 165.) As relevant here, a parent and child relationship "exists between a person and the person's natural parents, regardless of the marital status of the natural parents." (§ 6450, subd. (a)[7]; see *Britel, supra,* 236 Cal.App.4th at p. 135.) Section 6453 "contains the rules for determining who is a 'natural parent.' " (*Estate of Burden* (2007) 146 Cal.App.4th 1021, 1026.)

Under "section 6453, subdivision (a), a natural parent and child relationship is established where the relationship is presumed under the Uniform Parentage Act and not rebutted." (*Estate of Griswold* (2001) 25 Cal.4th 904, 921; *Scott v. Thompson* (2010) 184 Cal.App.4th 1506, 1514 [the intestacy statutes "incorporate the UPA to determine presumed fatherhood"].)

Relevant here, subdivision (b) of section 6453 provides in part: "A natural parent and child relationship may be established pursuant to any other provisions of the Uniform Parentage Act, except that the relationship may not be established by an action under subdivision (c) of Section 7630 of the Family Code unless any of the following conditions exist: [¶] (2) Parentage is established by clear and convincing evidence that the parent has openly held out the child as that parent's own." (§ 6453, subd. (b)(2).)

---

[7]    A parent and child relationship can also exist between "an adopted person and the person's adopting parent or parents." (§ 6450, subd. (b).)

Also relevant here, under the UPA, a person is presumed the natural parent of a child if the "presumed parent receives the child into their home and openly holds out the child as their natural child." (Fam. Code, § 7611, subd. (d).) The presumption created under section 7611 of the UPA "affect[s] the burden of proof and may be rebutted in an appropriate action *only* by clear and convincing *evidence*." (Fam. Code, § 7612, subd. (a), italics added.)

B. *Analysis*

It is *undisputed* that Charles and Frances took two-year-old Judy into their home in 1951, after she was abandoned by her birth parents; that Judy lived in the home of Frances and Charles for the duration of her childhood; that when Judy was about 11 years old, Charles, Frances, and Judy moved to Indiana, where Frances and Charles openly held Judy out as their daughter; and that during their lifetimes, Frances and Charles considered Judy to be their natural child and Judy considered them her natural parents.

Indeed, school records dating back to 1961 show Judy was registered for the sixth grade with the last name "Bloodgood" and identified as the child of Frances and Charles; that Judy listed Frances and Charles as her mother and father on her 1968 marriage certificate; that Charles's 1993 obituary identified Judy as his daughter and Judy's two children as his grandchildren; that Charles's March 1988 Last Will and Testament referred to Judy as his daughter and provided that, if Frances predeceased him, Judy would inherit all of his property, and that if Judy also predeceased him, all of his property would go to Judy's children, to whom he referred as "my grandchildren"; and that Judy's death certificate identified Frances and Charles as her parents.

Shannon wisely concedes the undisputed facts establish by "clear and convincing evidence" that, for purposes of intestate succession, Charles received Judy into his home and openly held her out as his natural child.

17

There also is no evidence that during his lifetime, Charles ever disavowed their relationship. (See Prob. Code, § 6453, subd. (b)(2); Fam. Code, § 7611, subd. (d); see also *Lund*, *supra*, 26 Cal.2d at pp. 494–495 [once the petitioner attains the status of a "*de facto*" family member, that status remains "unless disavowed" or "terminated"].)

It is Shannon's contention, however, that the presumption of natural parenthood created under the UPA can be rebutted based on "both facts *and policy*." (Italics added.) She argues "[b]y providing that the presumption of natural parenthood can be rebutted in an 'appropriate action,' " Family Code section 7612, subdivision (a), "gives courts wide discretion to determine whether bestowing the honor of parenthood is 'appropriate' under all of the circumstances considering both facts and policy." And here, she argues, this case is an " 'appropriate action' " in which rebuttal is "required" by public policy, "because granting Charles the status of a 'natural parent' would reward the participants in an irregular adult-child relationship that is not sanctioned by the laws of their own home state of Indiana, and which would thwart California's policies for the protection of children, ranging from requiring due process and oversight of foster placements and guardianships of children to encouraging prompt formal adoption and discouraging parents from giving their children away." We are not persuaded.

First, we note, consistent with the probate court's finding, that Shannon has proffered *no facts*, and thus impliedly concedes there are none, to rebut the presumption of natural parenthood between Charles and Judy under the UPA.

Second, although highlighting the language "in an appropriate action" in Family Code section 7612, subdivision (a), Shannon overlooks the plain language of the same subdivision in the statute that provides "*only . . . clear*

18

and convincing *evidence*" may rebut the presumption of a natural parental relationship.  (Fam. Code, § 7612, subd. (a), italics added.)  Subdivision (b) of Family Code section 7612 then provides that, "If two or more presumptions arise under Section 7611 that *conflict with each other*, or if one or more presumptions under Section 7611 conflict with a claim by a person identified as a genetic parent pursuant to Section 7555, the presumption that *on the facts* is founded on the weightier considerations of policy and logic controls." (Italics added.)

Thus, there are two threshold problems with Shannon's argument that public policy alone may rebut the presumption of natural parenthood between Charles and Judy.  One, Family Code section 7612, subdivision (a), permits "*only*" clear and convincing "*evidence*" to rebut the presumption. (Italics added.)  Two, only where there are conflicting presumptions—and here there are none—it is the presumption which "*on the facts*" is founded on the weightier considerations of policy that controls.  (Fam. Code, § 7612, subd. (b), italics added.)  Therefore, based on the plain language of the statute, we conclude the natural parent and child relationship between Charles and Judy can only be rebutted by clear and convincing evidence and not for reasons of public policy, as Shannon argues.  (Fam. Code, § 7612, subd. (a); see *Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1038 ["It is a maxim of statutory interpretation that courts should give meaning to every word of a statute and should avoid constructions that would render any word or provision surplusage."]; *Maricela C. v. Superior Court* (1998) 66 Cal.App.4th 1138, 1143–1144 [courts should give the words of a statute "their ordinary, everyday meaning" and neither interpretation nor construction is required where the language "is without ambiguity, doubt, or uncertainty"].)

19

But even if the natural parent and child presumption between Charles and Judy could be rebutted purely on public policy grounds—a premise we reject—we disagree with Shannon's assertion that public policy, including the ones she identifies, "requires" a California court to reject the natural parental relationship between Charles and Judy.

The paternity presumptions, including Family Code section 7611, subdivision (d), at issue in this case, are rooted in the " 'strong social policy in favor of preserving [an] ongoing [parent] and child relationship.' " (*In re Nicholas H.* (2002) 28 Cal.4th 56, 66 (*Nicholas H.*).) The presumptions are " 'driven by state interest in preserving the integrity of the family and legitimate concern for the welfare of the child. The state has an " 'interest in preserving and protecting the developed parent-child . . . relationships which give . . . children social and emotional strength and stability.' " ' " (*Id.* at p. 65.)

As we have noted, Frances and Charles took two-year-old Judy into their home in 1951, after she had been abandoned by her birth parents, and raised the child as their own for the duration of their lifetimes. Although Judy was not their biological child, recognition of their natural relationship promotes this state's " 'strong social policy' " of preserving the parent and child relationship. (See *Nicholas H.*, *supra*, 28 Cal.4th at p. 66.) To find no such relationship existed in this case, as Shannon argues, would in our view severely undermine this important policy. (See *id.* at p. 65 [noting a person " ' " ' "who has lived with a child, treating it as his [or her] son or daughter, has developed a relationship with the child that should not be lightly dissolved" ' " ' "].)

Shannon relies on *In re Karen C.* (2002) 101 Cal.App.4th 932 (*Karen C.*) in support of various policy considerations she contends should apply in

rebutting the parentage presumption between Charles and Judy. *Karen C.* does not help our analysis in this case. *Karen C.* involved a petition by a 12-year-old girl who sought an order from the juvenile court determining the existence of a natural mother and child relationship between her and Leticia, the only mother the petitioner had ever known. (*Id.* at p. 934.) Karen's birth mother, Alicia, abandoned Karen at birth. (*Ibid.*) Leticia raised Karen as her own child, telling Karen she was adopted. (*Ibid.*) Karen had no further contact with Alicia, who returned to Guatemala along with Karen's father. (*Id.* at p. 935.) When Karen was 10 years old, she came to the attention of child protective services after Leticia abused her. (*Id.* at p. 934.) Karen was placed in a foster home and Leticia was offered services, but failed to reunify with Karen. (*Id.* at pp. 934–935.) It was under these circumstances that Karen petitioned for a court order decreeing that Leticia was her natural (and legal) mother. (*Id.* at p. 935.)

In vacating the juvenile court's order denying the petition and in remanding for further proceedings, *Karen C.* held the UPA applied equally to women as to men; that Karen had standing under the UPA to bring the action; and that on remand the juvenile court should weigh the competing presumptions presented by the case—based on Alicia being her birth mother, and Leticia openly holding Karen out as her own child, and decide whether this was " 'an appropriate action' " under subdivision (b) of Family Code section 7612 to rebut the natural parent presumption. (*Karen C., supra*, 101 Cal.App.4th at pp. 938–939.) Regarding the last point, for guidance on remand, *Karen C.* stated it expressed no opinion "whether an undocumented de facto 'adoption' of the type effectuated here at the time of Karen's birth can be condoned by the courts in the face of the principles that adoption requires

an expeditiously sought court decree," while noting that "parents cannot give their children away."  (*Id.* at pp. 940–941.)

Clearly, the facts and legal issues presented in *Karen C.* are nothing like those before us now.  Unlike *Karen C.*, here there are no competing presumptions arising under the UPA—let alone competing presumptions "on the facts" (Fam. Code, § 7612, subd. (b))—and we are not called upon to decide whether an "undocumented de facto 'adoption' " of a minor involved in a dependency proceeding should be "condoned"  (*Karen C., supra,* 101 Cal.App.4th at pp. 940–941).

In sum, even assuming policy considerations alone could rebut the presumption of natural parenthood between Charles and Judy, we would conclude there are none that would require us to reject the conclusion that Charles was the natural parent of Judy.

## DISPOSITION

The August 16, 2021 order of the probate court finding that Judy is an intestate heir of decedent Loch David Crane is affirmed.  Judy shall recover her costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

DO, J.

WE CONCUR:


IRION, Acting P. J.


DATO, J.

22